### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**DAVID W. KRAUSS,**

>                    **Plaintiff,**

**-vs-**                                         **Case No.  6:06-cv-711-Orl-UAM**

**COMMISSIONER OF SOCIAL
SECURITY,**

>                    **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff David Krauss ["Krauss"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance benefits.  *See* Doc. No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is remanded pursuant to sentence four of 42 U.S.C. § 405 (g).

## I.    PROCEDURAL HISTORY

On November 13, 2002, Krauss filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of August 20, 2002 due to bipolar disorder and depression.  R. 48-50, 265-67.  His request was denied initially and upon reconsideration.  R. 27-30, 32-33, 271-72.  On June 8, 2005, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a hearing on Krauss' claim in Orlando, Florida.  R. 274- 304.  Non-attorney Robert Hicks represented Krauss at the hearing.  R. 274.  The ALJ heard testimony from Krauss and Jane Beougher, an impartial vocational expert ["VE"].

On December 29, 2005, the ALJ issued a decision that Krauss was not disabled and not entitled to benefits. R. 15-24. Following a review of the medical and other record evidence, the ALJ found that Krauss retained the residual functional capacity ["RFC"] to perform medium work, meaning he could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; sit, stand, or walk for six hours in an eight hour workday. R. 24, Finding 5. The ALJ also found that Krauss "can perform simple repetitive tasks, although his pace may be inconsistent at times." *Id.* After hearing testimony by the VE, the ALJ found that Krauss could perform his past relevant work as a bus boy and valet parker. R. 24, Finding 7. The ALJ therefore concluded that Krauss was not disabled. R. 24, Finding 10.

On March 31, 2006, the Appeals Council denied review. R. 5. On May 24, 2006, Krauss timely appealed the Appeals Council's decision to the United States District Court. Doc. No. 1. On November 15, 2006, Krauss filed in this Court a memorandum of law in support of his appeal. Doc. No. 13. On December 26, 2006, the Commissioner filed a memorandum in support of his decision that Krauss was not disabled. Doc. No. 14. The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Krauss assigns three errors to the Commissioner. First, he claims that the RFC finding is wrong in light of the Department of Veterans Affairs ["VA"] finding that he was "100 % disabled." Doc. No. 13 at 8-12. Second, Krauss claims that the hypothetical questions posed to the VE were unclear and also did not accurately capture his limitations, in particular, those outlined by the VA. *Id.* at 13-15. Third, Krauss claims that the Commissioner erred in finding Krauss "not fully credible" where Krauss has documented impairments that cause severe mental limitations. *Id.* at 15-17.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the VA's determination was not binding on the Commissioner and that the ALJ's rejection of the VA's determination was proper.   Doc. No. 14 at 4-9.   The Commissioner further responds that substantial evidence supports the ALJ's RFC finding, the hypothetical questions posed to the VE, and the credibility finding.  *Id.* at 9-19.

**III.**   **THE STANDARD OF REVIEW**

    **A.**   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g.  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991.  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied.

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four.   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990.  This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984.  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985.

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996.  To remand under sentence four, the

district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled.

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment.  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation.  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g. To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994.

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## IV.   APPLICATION AND ANALYSIS

### A.   THE FACTS

Plaintiff was born on February 3, 1971 and was thirty-four years old on the date of the ALJ's decision to deny benefits. R. 15, 279. He has a high school degree, and he completed two years of community college. R. 71, 280. Krauss served in the Marine Corps for approximately three years

---

[1] The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

until August 1992, when he was discharged due to his personality disorder.  R. 48, 280-81.  He also

has past work experience as a recruiter, screen printer-plastics, electronics assistant trainer, laborer,

mortgage broker, bus boy, and valet parker R. 15-16, 66, 79-86.  He claims disability as of August 20,

2002 due to bipolar disorder and depression.  R. 65.  After his alleged onset date, Krauss worked as

an auto parts delivery person and a roof pressure-washer for approximately three months in the

beginning of 2003, but he did not engage in any substantial work activity after those three months.

R. 283- 284.

　　　　While he was in service with the Marine Corps, Krauss was hospitalized for "acute suicidity"

for two days at the Naval Hospital, Camp LeJeune and diagnosed with alcohol dependence, bipolar

disorder, and a personality disorder.  R. 142-43.  As a result of this diagnosis, Krauss was discharged

from military service.  *Id.*  Several years after his discharge, between August 1998 and March 2001,

Krauss received treatment for bipolar disorder, depression, and substance abuse at the Virginia Mason

Medical Center and with Dr. Ray C. Davis in Georgia.  R. 114-20, 139-41, 144-47.  Krauss

complained of paranoia and depression and admitted to drinking alcohol and using marijuana.  *See,*

*e.g.,* R. 116.  The doctors prescribed various medications, including Tegretol, Depakote, and Mellaril.

R. 114-20, 139-41.

　　　　On October 24, 2002, Krauss visited the Department of Veterans Affairs ["VA"] emergency

room seeking medication for bipolar disorder.  R. 148.  He denied suicidal or homicidal ideas and

reported that he had been attempting to receive mental health treatment with the VA for the previous

eight months.  *Id.*  On October 28, 2002, Krauss presented at the VA emergency room again

requesting psychiatric medications and admission to the mental health clinic.  R. 149.  He

acknowledged having a substance abuse problem and agreed to begin attending Narcotics Anonymous meetings. *Id.* He reported experiencing depression and mania (during which he had "racing thoughts"), pressured speech, hypersexuality, agitation, and grandiosity. *Id.* He also went on spending sprees, resulting in significant debt and the need to file bankruptcy, and experienced auditory hallucinations "of a whispered voice telling him 'kill, kill, kill.'" *Id.* Krauss also complained of depression, which was manifested by a loss of appetite, crying spells, lethargy, feelings of worthlessness, and loss of concentration. R. 150. He reported being a binge drinker previously, while in the military, but stated that he rarely drank because it exacerbated his depression. *Id.* The VA doctor diagnosed Bipolar Disorder and marijuana abuse on Axis I and assigned a Global Assessment Functioning Score ("GAF") of 45 on Axis V.[2] The doctors also advised Krauss to continue taking his medications (Depakote, Klonopin and Wellbutrin), but he was advised that he would need ongoing liver tests because of side effects associated with Depakote. *Id.*

On November 21, 2002, Krauss returned to the VA's psychiatric division for a follow-up appointment. R. 153. Krasuss reported feeling energized, anxious, and complained that he was having difficulty sleeping due to the Wellbutrin. *Id.* Krauss also told the doctor that he planned to

---

[2]The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] describes the five axes included in "the DSM-IV multiaxial classification" as:

> Axis I    Clinical Disorders; Other Conditions That May Be a Focus of Clinical Attention
> Axis II   Personality Disorders
> Axis III  General Medical Conditions
> Axis IV   Psychosocial and Environmental Problems
> Axis V    Global Assessment of Functioning.

The Global Assessment of Functioning ("GAF") Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF code of 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

move to Orlando to live with his parents in order to stay sober.  *Id.*  The doctor told Krauss to stop taking Wellbutrin and begin taking Mirtazapine as an antidepressant.  R. 154.  Krauss was also advised to continue taking Depakote and Klonopin, as prescribed.  *Id.*  The doctor assessed Bipolar Disorder and marijuana and cocaine abuse on Axis I and a GAF of 50.  R. 153.

Upon referral from the Division of Disability Determinations, Josette Jourdan, M.D., saw Krauss for a consultative psychiatric evaluation on March 27, 2003.  R. 155-58.  Krauss related his personal and medication history.  R. 155-56.  He told the doctor that he has held numerous jobs but that he could not keep a job due to his depression, sleeping late, and feelings of anger.  *Id.*  He also reported taking Clonazepam, Remerom, and Depakote, and stated that he continued to experience some anxiety and depression while medicated but that he has fewer "ups and downs."  R. 157.  Dr. Jourdan diagnosed bipolar affective disorder, polysubstance abuse "in remission," and alcohol abuse on Axis I, narcissistic personality traits on Axis II, and "None" on Axis III.  R. 158.  The doctor also concluded that Krauss appeared to be able to handle his work independently without support or supervision; that he would be likely to perform a task "appropriately and effectively"; that Krauss seemed to "approach a new job with enthusiasm, invest much energy at it during the initial period but then gets burned out, is displeased, feels he is not rewarded enough for his productivity, gets bored, slows down and quits, not sustaining his performance over an extended period of time"; that Krauss has had difficulties with supervisors and co-workers because "they tend to unnerve him"; that Krauss did not report any clear episode of decompensation due to stress at work, but that he likely leaves his jobs before the "eventual decompensation due to the pressure of work."  *Id.*  Dr. Jourdan opined that

Krauss' prognosis was "[g]uarded" and added that Krauss "seems to have insight into his need for treatment and probably is treatment compliant." *Id.*

On April 14, 2003, Susan H. Shapiro, a non-examining state agency psychologist, completed a Mental Residual Functional Capacity Assessment. R. 159-76. Dr. Shapiro opined that Krauss was not significantly limited in most work-related abilities, except that Krauss was "moderately limited" in the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R. 159-60. Dr. Shapiro also opined that Krauss had no restrictions in his activities of daily living and in maintaining concentration, persistence, or pace; mild difficulties in maintaining social functioning; and one or two episodes of decompensation of extended duration. R. 172A.

Krauss received treatment from the VA hospital in Orlando between April 2003 and December 2004. On April 15, 2003, Mr. Krauss was seen at the VA, requesting psychiatric treatment. R. 246. He complained of experiencing depression, crying spells, and decreased sleep and appetite and of having thoughts of hurting himself. R. 246, 251. He complained of chest discomfort prior to the visit that he believed was related to his anxiety. R. 248. Krauss also admitted using marijuana four days before the visit and cocaine three weeks before the visit. *Id.* His urine test was negative for illegal drugs. *See* R. 249-50. The VA doctor assessed bipolar affective disorder, mood disorder due to substance abuse and depression on Axis I, and assigned a GAF score of 40 to 50 on Axis V. R. 247. The doctor prescribed Risperdal (an antipsychotic drug), Remeron for depression (the doctor noted that he chose this medication because Krauss complained of having difficulty sleeping), and Klonopin

-10-

for anxiety.  *Id.*  The doctor also recommended outpatient psychiatric and psychological treatment, anger management therapy, and alcoholic anonymous and narcotics anonymous meetings.  *Id.*

In October 2003, the VA determined that Krauss' bipolar disorder had worsened.  R. 54-57. The VA increased his disability rating from ten to fifty percent, effective as of November 14, 2002. *Id.*  As "evidence" for the increased rating, the VA cited a September 5, 2003 Orlando VA examination[3] in which Krauss was diagnosed with mixed bipolar disorder and assigned a GAF score of 55.[4]  R. 57.  The VA decision further noted that on that date, Krauss' symptoms included anxious mood and limited insight and judgment.  *Id.*  The VA decision also explained:

> Based on symptoms and GAF as described in VA exam (sic), the evaluation of bipolar disorder is increased to 50 percent disabling effective November 14, 2002, date of claim.  A higher evaluation of 70 percent is not warranted unless there are deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.

*Id.*

On October 24, 2003, the VA Vocational Rehabilitation and Employment service denied Krauss' application for vocational rehabilitation, stating that Krauss' "disabilities make it unreasonable to expect that [he] could use [the VA] program to get and keep competitive

---

[3]Krauss did not submit this record.

[4]A GAF code of 51-60 indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV at 32.

employment." R. 62.  The VA noted that it had considered Krauss' "new diagnosis of frontal lobe atrophy" in combination with Krauss' other conditions.  *Id.*

On November 6, 2003, Steven L. Wise, a non-examining state agency clinical psychologist, opined that an RFC assessment was necessary due to Krauss' mental limitations from his affective disorder. R. 177.  Dr. Wise also opined that Krauss had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and one or two episodes of decompensation of extended duration; and further noted that Krauss had substance addiction disorder by history only.  R. 185, 187.  The psychologist also opined that Krauss was "not significantly limited" in most abilities related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation to work settings, but stated that Krauss was "moderately limited" in the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and in the ability to "set realistic goals or make plans independently of others."  R. 191-92.  In his written notes, Dr. Wise observed: "[Krauss' biopolar disorder] symptoms reduce his concentration at times, and his pace is likely to be inconsistent over time.  He is otherwise capable of simple repetitive tasks."  R. 193.

Thereafter, on December 1, 2003, Krauss returned to the VA for a medication evaluation.  R. 244. The VA doctor stated that psychological test results indicated that Krauss had "some frontal lobe impairment which is likely related to his affective lability and, at times, poor judgment."  *Id.*  The doctor further noted that Krauss remained anxious, mildly agitated, and socially isolated, and that Krauss had been seen by the VA on October 2, 2003 for an evaluation of suicidal ideation.  *Id.*  the

-12-

doctor further reviewed Krauss' history of medication and observed that he did not "do well" on Depakote or Carbamazepine.  *Id.*  The doctor assessed bipolar disorder and frontal lobe syndrome on Axis I, social environment, financial, and job-related problems on Axis IV, and assigned a GAF score of 54.  R. 244-45.  The doctor advised Krauss to continue taking his current medication and noted that Krauss was "compliant, and in agreement [with the] treatment plan."  R. 245.

During his next visit on January 26, 2004, Krauss complained that his quetiapine medication "knocked him out," even when he took half of his recommended dosage.  R. 243.  The VA doctor stated: "Unfortunately, [Krauss] is very sensitive to all medications that might help him," and assessed bipolar disorder on Axis I, primary support group, social environment, financial, and job-related problems on Axis IV, and a GAF score of 57.  *Id.*  The doctor changed his medication from quetiapine to hydroxyzine and again noted that Krauss was "compliant, and in agreement [with the] treatment plan."  *Id.*

On March 30, 2004, Krauss returned to the VA and reported that he "remains very much out of control."  R. 241.  He told the doctor that his medications helped "a little" but not for long, and that he did not leave his house because he did not get along with people.  *Id.*.  Krauss' father informed the doctor that Krauss had not used drugs or alcohol, but that he was "very difficult to live with."  *Id.*  On examination, the doctor observed that Krauss had a restricted affect, an anxious mood, rapid speech, and some mild agitation.  *Id.*.  The doctor assessed bipolar disorder with predominantly manic symptoms on Axis I and a GAF score of 52.  *Id.*  The doctor also recommended that Krauss try lithium medication and added a prescription for lorasepam.  *Id.*

-13-

On April 28, 2004, Krauss was admitted to the VA hospital in Tampa, Florida after suffering an exacerbation of the bipolar disorder. R. 198. At the time of admission, Krauss stated that he had such severe anger that he felt like hurting people and that he even wanted to choke his own mother. R. 199. Krauss stayed at the hospital for ten days until May 7, 2004. *Id.* The VA hospital notes indicate that Krauss had been non-compliant with his medication by using drugs prior to admission and by missing his dosages of Lithium. R. 200. Krauss reported that he had been taking his medication (Lithium and Klonopin) since March 30, 2004, but that he took his Lithium only one time a day, rather than two, because he "feels cloudy" and because he has problems functioning on the medication. R. 198-199. Krauss tested positive for cannabinoids, and his liver function tests were abnormal. R. 201. During his stay at the hospital, he was compliant and participated in group and individual therapy. *Id.*

On discharge, the VA doctor diagnosed: bipolar disorder, noncompliance with treatment, cannabis abuse, cocaine dependence "without physiological dependence in sustained full remission," alcohol dependence, also "without physiological dependence in sustained full remission"; occupational problems and problems with social environment on Axis IV; a GAF score on admission of 40; and a GAF score on discharge of 64.[5] R. 198. The doctor prescribed an increased dosage of Lithium and quetiapine. R. 202.

On July 2, 2004, Krauss returned to the VA for a medication evaluation and reported feeling more subdued, and stated that he was concerned about becoming depressed. R. 206. The doctor

---

[5]A GAF code of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household). DSM-IV at 32. In general, a person with this score is functioning "pretty well" and "has some meaningful interpersonal relationships. *Id.*

-14-

diagnosed bipolar disorder and assigned a GAF score of 58.  *Id.*  The doctor also added a prescription for venlafaxine.  *Id.*

In September 2004, the VA reevaluated Krauss' disability rating, and "assigned a permanent 100% disability evaluation . . . effective March 30, 2004, because [Krauss is] unable to work due to [his] service connected disability/disabilities."  R. 53.  Krauss submitted the first two pages of a September 15, 2004 letter informing him of the disability rating increase, but letter appears incomplete.  *See* R. 53-54.

Krauss returned to the VA mental health clinic on October 14, 2004.  He discussed his spiritual beliefs, his Buddhist practices, and his attempts to control his anger.  R. 262.  He appeared alert, oriented, and without any acute symptoms of anxiety or depression.  *Id.*  He visited the VA again on December 23, 2004 and reported doing "OK in general," although he reported that he stopped taking trazodone and all antidepressants because they did not "agree with him."  R. 258.  He reported taking hydroxyzine and quetiapine, and requested refills.  *Id.*  The doctor diagnosed bipolar disorder and assigned a GAF score of 62.  *Id.*

Krauss testified at the hearing before the ALJ on June 8, 2005.  According to Krauss, he worked two jobs in 2003, but he had to leave the jobs due to his "condition."  R. 284.  Krauss also stated that he has held numerous jobs, which he also left because the stress of the work exacerbated his condition.  R. 285-88.  Krauss testified that his bipolar disorder and frontal lobe atrophy cause severe manias, during which he sleeps very little, and after which he "crash[es]" and experiences periods of depression, sometimes lasting two to three months.  R. 289.  He takes medication and also uses meditation and Buddhist practices to alleviate his anxiety.  R. 290-91.  He testified that he lives

-15-

with his parents; he has not used illegal drugs for the past three years (although he also testified that he used marijuana as a mood stabilizer on occasion if he did not have a medication available); and that he does not drink alcohol because it exacerbates his depression and causes him to have suicidal thoughts. R. 291-92, 296. Krauss further testified that other people shop for him and that he does not shop for his own groceries unless necessary because he feels anxious, paranoid, "stressed out," and angry in large crowds. R. 293. He helps out with household chores; can take care of his own personal needs (such as bathing and personal hygiene); and was involved in a Buddhist organization, but "had a falling out with them and [is now] isolated." R. 292, 294-95. He meditates, reads, listens to music, and gardens as stress therapy. R. 293-94. Krauss further stated that his sleep was irregular due to his periods of mania and that he did not take his medication in April and May 2004 (prior to his admission to the VA hospital in Tampa) because he was concerned about the effect on his liver. R. 297-99.

### B.   THE ANALYSIS

#### 1.   VA Disability Determination

Krauss first claims that the ALJ did not afford adequate weight to the VA finding that he was "100 % disabled." The Commissioner responds that the VA's determination was not binding on the Commissioner; that deference to the VA determination would be "contrary to the directives of the [Social Security] Act"; and that the ALJ's rejection of the VA's determination was proper.

The Commissioner is incorrect. Although a VA disability determination rating is not binding on the Commissioner, "it is evidence that should be considered and is entitled to great weight."

-16-

*Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981)[6]; *see also Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) ("[t]he findings of disability by another agency, although not binding on the Secretary, are entitled to great weight"). In *Rodriguez,* the Fifth Circuit even noted that "[a] VA rating of 100% disability should have been more closely scrutinized by the ALJ." *Rodriguez*, 640 F.2d at 686.

In this case, the ALJ, in a few broad sentences, summarily rejected both the October 2003 and September 2004 VA determinations that Krauss was fifty percent and 100 percent disabled, respectively. *See* R. 22. More specifically, the ALJ noted that the VA findings contained "no indication of limitations, no evaluation of jobs [Krauss] could or could not perform[,] no work limitations [were] discussed . . . [and] no discussion of [Krauss'] drug/alcohol abuse." *Id.* The ALJ then generally concluded that the VA "opinion is inconsistent with the other substantial evidence in the record and is not accorded controlling weight." *Id.*

These statements, however, are not entirely accurate. The VA's October 2003 finding listed numerous limitations associated with seventy percent or higher disability rating (including "difficulty in adapting to stressful circumstances (including work or a worklike setting)") and noted that Krauss' symptoms "included anxious mood as well as limited insight and judgment." *See* R. 57. Furthermore, it is not obvious that substantial evidence supports the ALJ's summary rejection of the VA's findings. In fact, the record reflects that, between April 2003 and December 2003, VA doctors examined and treated Krauss for bipolar disorder and frontal lobe syndrome and that these doctors regularly assessed

---

[6]Rodriguez was decided on March 25, 1981. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981.

relatively low GAF scores, indicating serious to moderate impairments. *See, e.g.,* R. 206, 243, 247. Indeed, Dr. Wise, the state agency psychologist on whose findings the ALJ purported to rely (*see* R. 22), opined that Krauss was "moderately limited" in the abilities to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and to "set realistic goals or make plans independently of others." R. 191-92. Although the ALJ was not bound by the VA's findings, the agency's determinations, as in the *Rodriguez* case, deserved closer scrutiny. Remand is required for a further evaluation of why the VA findings are not entitled to "great weight."

### 2.      VE Hypothetical

Second, Krauss claims that the hypothetical questions posed to the VE were unclear and also did not accurately capture his limitations, in particular, those outlined by the VA. The Commissioner responds that substantial evidence supports the hypothetical posed to the VE.

Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments. In this case, the ALJ correctly recognized that Krauss' non-exertional impairments precluded exclusive use of the grids to establish that Krauss could perform other work that exists in the national economy, and thus correctly relied on VE testimony.

The VE testimony, however, was vague and confusing, and further did not correspond to the ALJ's RFC finding. In her written decision, the ALJ found that Krauss retained the RFC to perform medium work and that Krauss could perform simple, repetitive tasks, "although his pace may be

inconsistent at times." R. 24, Finding 5.[7]  In the hearing, the ALJ posed three different hypothetical

questions to the VE, and the VE provided different answers.  *See* R. 301-02.  The VE testified that an

individual who had "bipolar symptoms which would reduce his concentration at times and his pace

is likely to be inconsistent over time, but he's otherwise capable of simple, repetitive tasks" would be

able to perform Krauss' past relevant work as a bus boy, construction laborer, and valet parker.  R. 301

(emphasis added).   The VE then testified that a person who had "occasional" problems with

concentration and pace (meaning the person had problems one-third to two-thirds of the time) would

not be able to perform any jobs.  R. 302.  Finally, the VE testified that a person with "moderate

limitations with concentration and pace but could otherwise perform simple, routine, repetitive tasks"

would be able to perform Krauss' past relevant work, but the VE defined "moderate" as "[t]hat they

would have problems but was (sic) able to function satisfactorily."  *Id.*

        None of these descriptions corresponds to the ALJ's RFC finding for Krauss.  The VE's final

answer, in fact, implies that the individual does not have any actual impairments with concentration

or pace.  The VE testimony does not support the ALJ's finding that Krauss could perform his past

relevant work, and remand is necessary.  The Court further observes that the record, including Dr.

Jourdan's consultative examination findings, indicates that Krauss experiences anxiety around other

---

[7]The ALJ's explanation of her RFC finding in the body of her written decision seems to differ from her formal finding.  *Compare* R. 23 *with* R. 24, Finding 5.  In the body of her decision, the ALJ found that Krauss' mental impairments resulted in moderate restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation.  R. 23.  The ALJ then stated that Krauss' pace "may be inconsistent at times and he can perform simple repetitive tasks" and found that Krauss retained the RFC to perform medium work, "with the mental limitations indicated above."  *Id.*  It is not clear whether the ALJ found that a pace that is "inconsistent at times" is the same as "moderate difficulties in maintaining concentration, persistence, or pace" and whether the ALJ included "one or two episodes of decompensation" as part of the RFC finding.  Based on the ALJ's statements regarding the four broad functional areas, at the very least, ALJ certainly found that Krauss' mental limitations cause more than a minimal limitation in Krauss' ability to perform work activities.  *See* 20 C.F.R.  416.920a(d)(1).

individuals and that he would have problems working with superiors and co-workers.  *See* R. 158.
The ALJ agreed with Dr. Jourdan's findings and opinions (R. 22), but she did not include this
limitation, neither in her RFC finding nor her hypothetical questions posed to the VE.  Accordingly,
remand is required on this issue as well.

### 3. The ALJ's Credibility Determination

Finally, Krauss claims that the Commissioner erred in finding Krauss "not fully credible"
where Krauss has documented impairments that cause severe mental limitations.  The Commissioner
argues that the ALJ's properly found Krauss not totally credible.

In this case, the ALJ appeared to rely mostly on Krauss' activities of daily living, the May 2004
VA hospital records indicating that he was non-compliant on his medications, and Krauss' ability to
drive as support for finding him "not fully credible."  R. 22.  A reviewing court will not disturb a
clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v.
Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.
1986).  As the first and second issues require remand, the Court need not and cannot reach the
question of whether substantial evidence supports the ALJ's credibility finding.  The Court, again,
observes that the reasons listed by the ALJ do not directly address whether Krauss' mental condition
(including his anxiety around other individuals and whether he would have problems working with
superiors and co-workers) would result in limitations over time and in a workplace environment with
other individuals and possibly customers.

## V.    <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner is remanded pursuant to sentence four of 42 U.S.C. § 405 (g) to allow the Commissioner to reevaluate the evidence, to explain the basis for his decision, and to hold such further proceedings as he may be advised.  The Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 9th day of August, 2007.

*Donald P. Dietrich*

DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL              32817